# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

**F I L E D**

10-18-09

OCT 1 8 2009

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

v.

TAHAWWUR HUSSAIN RANA

**CRIMINAL COMPLAINT**

**MAGISTRATE JUDGE NOLAN**

CASE NUMBER:

**09 CR 849**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

Beginning no later than in or about late 2008 and continuing until in or about October 2009, at Chicago, in the Northern District of Illinois and elsewhere, defendant TAHAWWUR HUSSAIN RANA conspired with others, including an individual herein identified as Individual A, to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that they were to be used in preparation for, and in carrying out a conspiracy to commit acts outside the United States that would constitute the offenses of murder and maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of Title 18, United States Code, Section 956; all in violation of Title 18, United States Code, Section 2339A.

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
LORENZO BENEDICT
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

October 18, 2009
Date

at Chicago, Illinois
City and State

NAN R. NOLAN, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Lorenzo Benedict, having been duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since September 2004. I am currently assigned to conduct counter-terrorism investigations and have served in this position since March 2005. While working as a Special Agent, I have directed or otherwise been involved in investigating violations of federal law. I have completed FBI training in the investigation of counter-terrorism matters. As a result of my training and experience, I am familiar with the tactics, methods and techniques of terrorist networks and their members.

2. I submit that on the basis of the facts set forth in this affidavit, there is probable cause to believe that beginning no later than in or about late 2008 and continuing until in or about October 2009, at Chicago, in the Northern District of Illinois and elsewhere, defendant TAHAWWUR HUSSAIN RANA conspired with others, including Individual A, to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that they were to be used in preparation for, and in carrying out, a conspiracy to commit acts outside the United States that would constitute the offenses of murder and maiming if committed in the special maritime and territorial jurisdiction of the United States, in violation of Title 18, United States Code, Section 956; all in violation of Title 18, United States Code, Section 2339A.

3. This affidavit is based on my personal knowledge, on my review of records and other materials obtained during the course of this investigation, including recorded telephone

1

conversations and emails, as well as information provided to me by other investigators during the course of this investigation. Searches and surveillance have been conducted pursuant to lawful court orders. Because this affidavit is for the limited purpose of setting forth facts sufficient to establish probable cause, this affidavit does not include all of the pertinent facts that I have learned in the course of this investigation.

4. This affidavit summarizes the contents of certain recorded conversations. Most of these recorded conversations were in the Urdu language. While translators have attempted to transcribe the foreign language conversations accurately, to the extent that quotations from these communications are included, these are preliminary, not final translations. Voice identifications for the calls are preliminary. In most instances, voice identifications are based on names used during the recorded conversations, voice recognition that has been accomplished to date by investigators, historical information developed during this investigation, toll records, physical surveillance and subscriber information.

5. This affidavit also includes descriptions of the contents of email communications, some of which were partially in the Urdu language. While translators have attempted to transcribe the foreign language portions of emails accurately, to the extent that quotations from these emails are included, these are preliminary, not final translations. Quotations from English language emails in this affidavit are as they appeared when they were sent or received, including typographical and other errors. Based on my training and experience, my consultation with translators, and the context of this investigation, I have included brackets where appropriate to explain my understanding of the recorded conversations and emails, including the coded language and terms used. The summaries

below do not include all potentially criminal conversations that have occurred during this investigation or all statements or topics covered during the course of the conversations described below.

### Summary

6.    As further set forth in this Affidavit, the evidence gathered to date by the government's investigation establishes probable cause to believe that RANA participated in a conspiracy with Individual A to provide material support and resources, and to conceal and disguise the nature, location, source and ownership of such material support and resources, knowing and intending that they were to be used in preparation for, and in carrying out, a conspiracy to commit terrorist acts involving murder and maiming outside the United States. Among other things, Individual A conducted extensive surveillance for the purpose of facilitating terrorist attacks, working in coordination with: an individual identified herein as "Individual B;" an individual identified herein as Lashkar-e-Taiba Member A (a member of Lashkar-e-Taiba, a Pakistani-based terrorist organization); Ilyas Kashmiri (a leader of Harakat-ul Jihad Islami ("HUJI"), another Pakistani-based terrorist organization); and others. RANA, who operated an immigration services business with offices in Chicago and elsewhere for which Individual A at times claimed to work, among other things helped arrange and conceal Individual A's travels to surveil potential targets for terrorist attacks and meet with others involved in planning acts of terrorism, discussed targets for terrorist attacks with Individual A, and helped to conceal the nature and purposes of Individual A's travels.

7.    Beginning in late 2008, Individual A corresponded with Individual B and Lashkar-e-

Taiba Member A regarding what they referred to in coded communications as the

"Mickey Mouse Project," "mmp," and "the northern project," which involved planning

for one or more attacks directed at facilities and employees of the *Morgenavisen Jyllands-*

*Posten* ("*Jyllands-Posten*"), a Danish newspaper which in 2005 published cartoons

depicting the Prophet Muhammed, to which many Muslims took great offense.

Individual B is associated with, among other entities, the Lashkar-e-Taiba terrorist

organization and with Ilyas Kashmiri, a leader of Harakat-ul Jihad Islami ("HUJI"),

another Pakistani-based terrorist organization.   Individual A and Individual B

communicated with associates, including Kashmiri and Lashkar-e-Taiba Member A,

regarding the planned attack.   In October 2008, Individual A had posted a message to an

internet discussion group – to which RANA also belonged – stating, with respect to the

Danish cartoonists and others he identified as "making fun of Islam," that "I feel disposed

towards violence for the offending parties."

8.    In January 2009, after extensive correspondence with Individual B regarding the Mickey

Mouse Project, in the course of which Individual B urged Individual A to "try to go as

early as possible to MMP," Individual A traveled to Copenhagen, Denmark, but only after

advising Individual B that he need to consult with RANA first.   RANA arranged portions

of Individual A's travel.   During that trip, Individual A visited two different offices of the

*Jyllands-Posten* – in Copenhagen and in Arhus, Denmark.   As cover for his visits to the

*Jyllands-Posten* offices, Individual A falsely represented that he was visiting on behalf of

RANA's immigration services business, First World Immigration Services ("First

4

World"); that First World was considering opening up offices in Denmark; and that he was interested in advertising the business in the *Jyllands-Posten*. While in Denmark, Individual A instructed RANA to be alert for email from a *Jyllands-Posten* sales representative, and to ask First World's Toronto and New York offices to "remember me," in case a representative of the *Jyllands-Posten* called. To further the cover story of Individual A, RANA, while in Chicago, replied to an email from the newspaper staff pretending to be Individual A, who was overseas.

9.    After visiting Denmark in January 2009, Individual A traveled to Pakistan to meet with Individual B. During this trip, he traveled with Individual B to the Federally Administered Tribal Area (FATA) region in northwestern Pakistan and met with Kashmiri. Individual A returned to Chicago in mid-June 2009. During his trip to Pakistan, Individual A sent his will to RANA; RANA responded by sending a coded message to establish a new email account.

10.    Following Individual A's return from Pakistan, Individual A communicated by email with Lashkar-e-Taiba Member A regarding the status of the Northern Project. Because Lashkar-e-Taiba Member A responded that he had "new investment plans," coded language for the planning of a different attack, Individual A and Individual B began to focus on working with Kashmiri to complete the attack on the newspaper.

11.    In late July 2009, Individual A traveled again to Copenhagen, Denmark, and to other locations in Europe. RANA again arranged portions of Individual A's travel. When Individual A returned to the United States, he told a Customs and Border Patrol inspector that he was traveling on business as a representative of RANA's business, First World

Immigration.  Individual A's luggage contained no papers or other documents relating to First World.

12.    Following Individual A's return to Chicago in August 2009, Individual A used coded language to inquire of Individual B on multiple occasions regarding whether Individual B had been in touch with Kashmiri regarding planning for the attack.  Individual A expressed concern that Individual B's communications with Kashmiri had been cut off.  Individual A kept RANA apprised of the developments concerning the lack of communication with Kashmiri.

13.    In early September 2009, Individual A and RANA took a lengthy car ride during which they discussed, among other things, the general activities of Individual B, Lashkar-e-Taiba, and Kashmiri, including past terrorist acts, and Individual A discussed with RANA five actions involving targets, including "Denmark."

14.    In early September 2009, Individual B called Individual A to report that Kashmiri might be dead.  Individual A expressed dismay and concern, and said that Kashmiri's death means "our company has gone into bankruptcy then," and that "the projects and so forth will go into suspension."  Shortly after initial press reports that Kashmiri had been killed in a drone attack in Pakistan, Individual A and Individual B had a series of coded conversations in which they discussed the reports of Kashmiri's death and the significance of Kashmiri's death for the projects they were planning.  Individual B sought to reassure and encourage Individual A, telling him, among other things, that "[t]his is business sir; these types of things happen."  Individual A kept RANA apprised of reports

6

of Kashmiri's death and advised Individual B that RANA was very upset at Kashmiri's death.

15. On or about September 17, 2009, Individual A discussed with Individual B the need, in light of Kashmiri's reported death, to turn back to Lashkar-e-Taiba Member A and another individual, to complete the planning for the attack on the newspaper.

16. On or about September 20, 2009, Individual A told an associate in Pakistan in a recorded telephone conversation words to the effect that he had spoken to RANA and they agreed that "business must go on." Individual A stated words to the effect that it does not matter for whom he works.

17. On or about September 30, 2009, Individual A was told by Individual B that Kashmiri was still alive. When Individual A asked whether he would meet Kashmiri on his trip, Individual B advised that Kashmiri had been asking about Individual A.

18. Individual A stated in recorded communications that he intended to travel to Pakistan in early October 2009 to meet with Individual B and Kashmiri. Individual A had a reservation to fly from Chicago, Illinois to Philadelphia, Pennsylvania on October 3, 2009 and indicated in recorded communications that he intended to travel on to Pakistan.

19. Individual A was arrested by FBI agents on October 3, 2009 as he prepared to board a flight from Chicago to Philadelphia. During a search of the luggage of Individual A, a memory stick was recovered that contained ten videos of Copenhagen, Denmark, including video focused on the Jyllands-Posten building as well as video of a nearby Danish military barracks, and a map of Copenhagen.

7

## Relevant Individuals

### *Tahawwur Hussain Rana*

20.    Defendant TAHAWWUR HUSSAIN RANA was born in Pakistan and is now a Canadian

citizen who primarily resides in Chicago, Illinois. RANA, who has received medical

training, is the owner of several businesses, including First World Immigration Services,

which has offices in Chicago, New York, and Canada. RANA also owns a farm in

Kinsman, Illinois, which is used to provide halal meat for Muslim customers, as well as a

grocery store in Chicago. Postings to a Yahoo group for graduates of a military school

located in the Pakistani town of Hasan Abdal (a group that refers to itself as "abdalians"),

reflect that both Individual A and RANA have participated in the group and referred to

their attendance at that school.

### *Individual A*

21.    Individual A at times has claimed to be a consultant with or representative of First World

Immigration Services, a company owned and operated by RANA. Surveillance of

Individual A's activities, as well as Individual A's phone conversations and email

exchanges, reflect that Individual A performs few services for First World. Individual A

has no known or reported employment other than with First World. His residence in

Chicago is an apartment leased to an individual who is deceased. Notwithstanding his

apparent lack of financial resources and substantial employment, Individual A has

engaged in extensive international travel since the second half of 2008, including multiple

trips to Pakistan and various countries in Europe. Records reflecting the locations of

internet protocol addresses used by Individual A to send emails indicate that Individual A

8

has spent substantial time in Pakistan and elsewhere during the last several years – often

for months at a time.

### Individual B

22.    Emails between Individual A and third parties reflect that Individual B was arrested by

Pakistani authorities in Summer 2009 and later released.  As noted above, Individual B is

associated with the Lashkar-e-Taiba terrorist organization, and with Ilyas Kashmiri, a

leader of Harakat-ul-Jihad-Islami ("HUJI"), a Pakistani-based terrorist organization,

among other entities.

### Lashkar-e-Taiba Member A

23.    Lashkar-e-Taiba has been designated by the United States Department of State as a

Foreign Terrorist Organization since 2001.  Based in Pakistan, Lashkar-e-Taiba has

claimed responsibility for numerous terrorist attacks, principally in India.  Lashkar-e-

Taiba Member A, whose identity is known to the government, is an individual with

substantial influence and responsibility within Lashkar-e-Taiba.

### Ilyas Kashmiri

24.    International news media reports have identified Kashmiri as the operational chief of the

Azad Kashmir section of Harakat-ul-Jihad-Islami ("HUJI") with links to al Qaeda.  In

April 2006, the United States Department of State issued the 2006 "Country Reports on

Terrorism," which listed a number of designated "foreign terrorist organizations" and also

listed "other selected terrorist groups also deemed to be of relevance to the global war on

terrorism."  HUJI was listed in the latter category.  The report noted the group's "links to

al Qaeda," and that "HUJI's operations in Kashmir were led by Commander Ilyas

Kashmiri, a former commander in the Afghan jihad, . . . . [who] was arrested in October [2005] on charges of attacks against President Musharraf in 2003." In September 2009, international news media reported that Kashmiri had been killed in a drone attack in the Waziristan region of Pakistan. In October 2009, Kashmiri issued a statement indicating that he was alive and that he was working with al Qaeda.

25.    On September 18, 2009, Individual A forwarded by email to RANA a news article concerning Kashmiri's death. The article was entitled "Pakistani Kashmiri militants now fighting NATO forces," and contained a number of details relating to Kashmiri, including the following:

    a.    Kashmiri was the ameer [leader] of the Azad Kashmir chapter of HUJI;

    b.    Kashmiri was considered to be one of the most dangerous al Qaeda-linked Pakistani commanders;

    c.    Kashmiri was no. 4 on the Pakistani Ministry of Interior's Most Wanted List;

    d.    Kashmiri had established a training camp in the Razmak region of Waziristan;

    e.    Kashmiri was named in a 12-page charge sheet filed by the Islamabad police in an anti-terrorism court for his role in the November 2008 murder of retired Major General Amir Faisal Alvi, the former General Officer Commanding of the Pakistan Army's Special Services Group. The charge sheet identified three people in the Alvi murder, including retired Major Haroon Ashiq, and alleged that the murder was carried out on the instructions of Kashmiri, who also had provided funds and weapons; and

    f.    Kashmiri also was named in a charge sheet relating to the October 2008 kidnaping of a renowned film producer and distributor. Major Haroon Ashiq was one of the kidnapers.

This same article reported that, following his arrest, Major Haroon Ashiq had told interrogators that Haroon, along with his younger brother Captain Khurram, had "joined hands" with Kashmiri in early 2008. The article stated that, according to Haroon, Kashmiri had tasked Haroon with kidnaping affluent people living in urban areas in order to raise money for Kashmiri's group.

26.    When Individual A forwarded the above-described news article to RANA, Individual A described the subject of the article as "Major Haroon (Hafiza hullahu)." The latter phrase translates to "May Allah protect him." Further, a review of contacts with phone numbers in one of Individual A's multiple email accounts reveals an entry for "Haroon" with a Pakistani phone number.

27.    On or about September 19, 2009, Individual A spoke by telephone to an associate in Pakistan and, using coded language, brought up the subject of Kashmiri's reported death. Individual A asked the associate if the associate had learned anything about "doctor," and stated words to the effect of: ""[h]e was you Pir Sahib [spiritual guide], where I and you went, we went to Samanabad and we did Baiat [an oath of allegiance]." After the associate responded, "[y]es sir, absolutely, absolutely," Individual A continued "he just had a heart attack . . . it has made me very sad." Based on my review of Individual A's communications concerning Kashmiri's death, I believe that the "heart attack" reference to be a coded reference to the reported fact that Kashmiri had been killed.

28.    In the same conversation of September 19, 2009, Individual A continued to discuss Kashmiri, noting the press coverage following his reported death. Individual A stated words to the effect of: "now many other great things about him have come to surface, his

11

supernatural powers and miracles, from his followers and others, yeah, they have also

printed a small paper about him and many other things."

**Methods of Communication**

29.    Individual A, RANA, Individual B and Lashkar-e-Taiba Member A have used several

methods of communication, including in-person meetings, telephone conversations

(including calls placed using long distance calling cards) and emails.  Individual A, in

particular, utilized a cell phone, the account for which is the name of a deceased

individual.  In nearly all of their communications, Individual A, RANA, Individual B and

Lashkar-e-Taiba Member A have used coded language.  As discussed below, in addition

to "Mickey Mouse Project," the co-conspirators have referred to this plot, as well as

discussions of other targets, as "investments," "projects," "business," "action" and other

like terms, and have described theirs hopes for success both in terms of receiving

religious awards, as well as getting "rich," "richer," and making "profit."

30.    Since the beginning of 2008, Individual A and RANA have communicated through the

use of multiple email accounts.  As discussed throughout this affidavit, Individual A,

RANA, Individual B and Lashkar-e-Taiba Member A have frequently used coded

language and changed their methods of communications in order to conceal the nature

and content of their communications.  For example, on or about March 4, 2009, after

acknowledging receipt of an email from Individual A, RANA sent a response with the

following pertinent content:

> One of my brothers in Brigadier **Movadat** Hussain Rana and the other is Sibte
> Hassan Rana **monie**.  They are in Rawalpindi.  I really admire emails making it

12

instant half mulaquat especially **yahoo** as it seems superior to hotmail.  Talk to you later.

(Emphasis supplied.)  Records reveal that the email account "mov.monie@yahoo" was created on or about March 6, 2009, at a particular internet protocol address, the user of which was located at the Chicago business address of First World Immigration.  That same day, Individual A accessed the mov.monie@yahoo account from an internet protocol address in the United Arab Emirates, and sent an email from mov.monie@yahoo to RANA at his personal email address, asking RANA to contact Individual B.

31.    Further, on or about August 28, 2009, in a recorded telephone conversation between Individual A and Individual B, Individual A spoke in coded language to describe a new account that Individual A had created for their continued communications.  More specifically, after informing Individual B that he had formed an account on the "same system," Individual A instructed him to write his colleague's name and his younger brother's name and write the names without spaces and write 1 with it.  On or about August 25, 2009, Individual A created such an account with a name blending two first names.

32.    On or about October 3, 2009, as Individual A was preparing to travel to Pakistan, Individual A spoke to RANA in a conversation that was recorded.  Individual A asked RANA to create an email account using the Gmail service with the user name "liaqatbin11."  Individual A instructed RANA to change the email account name after using it two or three times, and gave him directions for changing the name.  Individual A stated that the "liaqatbin" portion of the name would remain, but that the number 11

13

would change, and that to determine the second number, RANA should start by

multiplying by two and subtracting two. Individual A explained that the number used to

multiply 11 would increase by one with each new account. Individual A provided an

example, and RANA worked the math out loud for determining several numbers.

## The Danish Cartoons

33.    On or about September 30, 2005, the Danish daily newspaper *Jyllands-Posten* published

an article entitled "Muhammeds ansigt" ("The face of Muhammed"). The article

consisted of twelve cartoons, some of which depicted Muhammed, and an explanatory

text. The cultural editor for the *Jyllands-Posten* wrote:

> The modern, secular society is rejected by some Muslims. They demand a special
> position, insisting on special consideration of their own religious feelings. It is
> incompatible with contemporary democracy and freedom of speech, where one
> must be ready to put up with insults, mockery and ridicule. It is certainly not
> always attractive and nice to look at, and it does not mean that religious feelings
> should be made fun of at any price, but that is of minor importance in the present
> context. ... we are on our way to a slippery slope where no-one can tell how the
> self-censorship will end. That is why Morgenavisen Jyllands-Posten has invited
> members of the Danish editorial cartoonists union to draw Muhammed as they see
> him.

34.    The publication of the cartoons caused significant controversy in the Muslim community.

Many Muslims took great offense to depictions of the Prophet Muhammed.

35.    On or about October 29, 2008, Individual A posted a message to the Yahoo group called

"abdalians" to which RANA also belonged[1]:

---

[1]    A review of the content of the messages in this Yahoo group make clear that its
members are graduates of a military school in Hasan Abdal, Pakistan. Both Individual A and
RANA have posted multiple messages to this group, and have referred in one or more postings to
their own attendance at the school.

14

Everything is not a joke [identified individual being addressed by Individual A]. We are not rehearsing a skit on Saturday Night Live.  Making fun of Islam is making fun of Rasoosallah SAW [Messenger of Allah, Peace be on Him], . . . **call me old-fashioned but I feel disposed towards violence for the offending parties, be they cartoonists from Denmark** or Sherry Jones (Author of Jewel of Medina) or Irshad Manji (Liberal Muslim trying to make lesbianism acceptable in Islam, amongst other things) . . . **They never started debates with folks who slandered our Prophet, they took violent action.**  Even if God doesn't give us the opportunity to bring our intentions to fruition, we will claim ajr [a religious award] for it . . .

(Emphasis supplied).

### The Mickey Mouse Project

36.    Records of email accounts used by Individual A reflect that between in or about August 2008 and December 7, 2008, Individual A sent multiple email messages from internet addresses located in the Pakistani cities of Karachi and Lahore.  On or about December 7, 2008, before traveling from Pakistan to the United States that same day, Individual A used one of his email accounts to prepare a list of items for himself, which he titled "Mickey Mouse" and saved in his account.  The list included the following pertinent entries:

> Route Design (train, bus, air)
> Cross (Cover Authenticator)
> Trade? Immigration?
> Ad? (Lost Luggage)(Business)(Entry?)
> Kings Square (French Embassy)
> YMCA
> Car Trip + Train Option (Nufoozur Rehman)(weekend?)
> Residence for clients
> Complete Area Coverage (P.S. e.t.c.)
> Counter surveillance (magic eye)
> NDC option
> Lunch + Coffee spots
> Security (armed)?
> Foreman residence

Zoom
Entry and exit method in the house
Feasible plan
On return, procurement of machinery
Uniform
Mixed Fruit Dish
Cell phone and camera
Border Crossing
City Guide Map
Alternate Investment
Got Papers? (Clients)
Make Visiting Cards

37.    The *Jyllands-Posten* maintains a location at Kings Square in Copenhagen.  The French

Embassy is immediately adjacent to that location.

38.    On or about December 16, 2008, Individual A sent an email from Chicago, Illinois to

Individual B.  Among other statements, Individual A told Individual B in this email that

"I will be going for the Mickey Mouse project in the north in the middle of next month.

Let me know any new info on it."

39.    One week later, on or about December 23, 2008, Individual A again communicated with

Individual B concerning the Mickey Mouse project.  More specifically, in an email sent

from Chicago, Illinois, to Individual B, Individual A stated:

> Send me the info on the mickey mouse project later when I tell you.  For now,
> **should I leave here early or around the 14th like previously planned.**[2]  Do that
> special thing you do and tell me. . . .
> Bye,
> [Individual A]

(Emphasis supplied).

---

[2]       As described further below, Individual A departed from Chicago on January 13,
2009, before arriving in Copenhagen, Denmark days later.

16

40.     On or about December 24, 2008, Individual B responded to Individual A's email from the

previous day, telling Individual A to "try to go as early as possible to MMP." In

response, Individual A used code to request Individual B to use a different email address

to further communicate with Individual A. More specifically, Individual A stated:

> **our doctor friend [RANA] has gone to Canada till 3jan with family.**[3] So I am
> here alone. Planning for MMP. send me info about it on other mail I gave
> starting with [the first four letters of one of Individual A's email accounts] if you
> don't have it i will mail you from it. . . . How is your friend Harry. Did you
> check the lady naipaul link.[4] . . .
> Ok take care.
> [Individual A]

41.     The next day, on or about December 25, 2008, Individual B responded:

> i know ur other email address, no need to use that address yet..**first u visit MMP
> than we will discuss and c the concerned person** if needed, and if your friends
> decline , we'll do that ,i have discussed with baray log . . .

(Emphasis supplied). I believe from a review of emails before and after this exchange, as

well as subsequent telephone conversations between Individual A and Individual B,

discussed more fully below, that Individual B was instructing Individual A to travel to

Copenhagen, then travel to Pakistan to meet with Individual B ("we will discuss") and a

---

[3]     Records demonstrate that RANA re-entered the United States from Canada near
Detroit on or about January 1, 2009.

[4]     Lady Naipaul is a Pakistani journalist and the wife of the late Lord V. S. Naipaul,
a Nobel prize winning author. Lady Naipaul also is the sister of Amir Faisal Alvi, the former
Pakistani General killed in November 2008, allegedly by a group that included Major Haroon.
Although Pakistani press reports reflect that Haroon was arrested by Pakistani police on or about
February 24, 2009 in connection with General Alvi's murder, it is noteworthy that this email
reference to Individual B's "friend Harry" in the context of "the Lady Naipaul link" occurred in
late December 2008, shortly after General Alvi's murder and well before public reports of
Haroon's involvement in the murder, and police action against Haroon. I understand "Harry" to
be a reference to Haroon.

third party ("c the concerned person"). Based on my review of subsequently recorded communications, I believe that the "concerned person" was Kashmiri.

42.　　In the aforementioned December 25, 2008 email, Individual B asked Individual A about RANA[5]: "how's the dr's reaction on what all is happening, is he terrified or relaxed." The next day, on or about December 26, 2008, Individual A responded to Individual B, "Doc [RANA] is very relaxed." Further, Individual A related that RANA was providing direction to Individual A, RANA is "trying to do Zihan saazi[6] asking if this happens you should act like this and if that happens you should do that and fear nothing except God."

43.　　Additionally, in the same December 26, 2008, email, Individual A related to Individual B that, prior to departing for the Mickey Mouse project, he needed to consult with RANA:

> Yes I am ready for MMP but I think it will better to go after new year as everything is shut down from Christmas to new year. **Also doctor [RANA] has gone to Canada with his family till new year so I need to consult him [RANA] as well. I will spend a week or so the first time to get a feel of the property.** If you have any other helpful info on this project, send it to me. If God wants **i will return by middle of next month to you.** If this Amal is maqbool and I get Ajr for it, I want my father to gt that Ajr.

(Emphasis supplied). I understand that Individual A is telling Individual B that he will visit Denmark – but only after consulting with RANA. Then, after getting a "feel of the property," Individual A will meet with Individual B in Pakistan ("return by middle of

---

[5]　　Based on my review of this communication, as well as others between Individual A and Individual B, I understand the references to "dr" and "doc" in this particular exchange to be references to RANA because, in part, Individual A states in one of the messages that "doctor has gone to Canada," and records demonstrate that RANA re-entered the United States from Canada near Detroit on or about January 1, 2009. In addition, as noted above, RANA has received medical training.

[6]　　I understand that the expression "Zihan saazi" refers to the act of one person [RANA] preparing someone else [Individual A] to perform an act.

next month to you"). Further, I understand the English meaning of "Amal" is good deed, "maqbool" is acceptable and "Ajr" is a religious award.

### Individual A's First Visit to Denmark

44. On or about Sunday, January 12, 2009, Individual A emailed Individual B concerning his upcoming travel. Individual A stated "I am leaving WED night your time and will be at the location Thursday [January 15] night your time. Pray that I make a lot of money on the project."

45. RANA arranged for at least a portion of Individual A's travel through Expedia, an online travel agency. On or about January 13, 2009, RANA received a confirmation email from Expedia relating to the first leg of Individual A's travel from Chicago to New York through Philadelphia. On or about January 15, 2009, Individual A arrived in Frankfurt, Germany.

46. On or about January 19, 2009, Individual A emailed RANA, the subject of which was "Copenhagen":

> Dear Doc,
> Sorry I missed your calls last night. . . . I checked out business opportunities here. They seem quite promising. **I am going rght now to see if I can put an ad for our company** and also check the feasibility to open up an office here. . . .
> Bye for now,
> [Individual A]

(Emphasis supplied). The same day, RANA responded, stating "Booking is for 24th at 10 p.m.. Good luck, . . . Tahawwur." Based on Individual A's subsequent departure from Europe on January 24, 2009, as further described below, I understand that RANA told Individual A that he had booked Individual A on a flight on January 24, 2009.

47.  On or about January 20, 2009, Individual A sent an email to RANA, the subject of which

was described "Copenhagen Important." Individual A stated in relevant part:

> Dear Doc,
>
> * * *
>
> Everything is fine here. I went to a newspaper to find out about advertising our
> company. I gave him my card so they might call any of the 3 offices to verify.
> **Ask NY and Toronto offices to remember me.** The rates are pretty steep, like
> 3000 dollars for the front page, for one time. The sales guys name was [name
> omitted] and he asked for our email to give detailed prices. I gave our business
> email, so keep alert for his mail.
>
> * * *
>
> Ok take care,
> [Individual A]

(Emphasis supplied). I understand Individual A's statement "Ask NY and Toronto offices

to remember me" to be a request to RANA to take additional steps to preserve the cover

story for Individual A's visit to the newspaper.

48.  Later that same day, on or about January 20, 2009, Individual A sent another email to

defendant RANA, the subject of which was described "Copenhagen." As in the email

described in the aforementioned paragraph, Individual A remained concerned that an

employee from the newspaper would contact First World Immigration. Individual A

asked RANA to "[p]lease confirm on the receipt of these emails." Further, Individual A

reminded RANA to alert First World's employees to the possibility of incoming

communications resulting from his contacts with the newspaper. Individual A wrote, in

relevant part:

I will leave this hotel Thursday morning and go to another city in this country for my vacation. I haven't decided which one, maybe arhus. So please tell ALL our offices if they receive a call about me, to please confirm my job there. ...
Take care,
[Individual A]

49.    On or about January 23, 2009, Individual A visited the *Jyllands Posten* office in Arhaus, Denmark, again under the auspices of checking rates for advertising in this newspaper. That same day, Individual A sent an email to defendant RANA, the subject of which was described as "Copenhagen and Arhaus." Individual A wrote in relevant part:

Ok Doc, . . . I checked for our office ad in Arhus as well. You might be receiving price quotes in your other email address. Did the Copenhagen guy, [name omitted] send you any mail yet? I think our company has a really bright future here. We will become rich or should I say richer. . . .
[Individual A]

50.    On or about January 26, 2009, consistent with Individual A's statement to RANA that he had given "our business email," an email was received at an email address subscribed to the address of First World Immigration and used by RANA, from a sales coordinator at the *Jyllands-Posten.*. The email stated in relevant part:

Dear [Individual A],

thank you for your visit at Jyllands-Posten Friday last week [January 23, 2009] concerning advertising in our newspaper.

51.    On or about January 29, 2009, RANA, posing as Individual A, responded to the aforementioned email, stating:

Thank you for your reply. I will be in touch soon. I am trying to coordinate with a local attorney in Denmark for taking care of our clients locally. I intend to visit you in the coming spring. Sincerely, [Individual A].

Records reflecting the internet protocol address from which this email was sent reveal

that it was sent from Chicago, Illinois, and, more specifically, the address of RANA's

residence. As of the date of this email, Individual A remained overseas.

52.    Although at times – including in his dealings with the *Jyllands-Posten* and an interview

with a Customs and Border Protection officer in August 2009 – Individual A has held

himself out as a representative of or consultant for First World Immigration Services,

First World Immigration Services has issued neither a W2 or 1099 to Individual A in the

years 2004 through 2008.

53.    Individual A's representations that his travel to Denmark was for the purposes of opening

an office for First World Immigration in Denmark appear implausible for multiple

reasons, including, among others, the following:

a.    A review of phone records for both Individual A's and RANA's home and
personal cell phones, as well as the phone records for five separate lines at First
World Immigration, has revealed not one phone call to Denmark during 2009;

b.    A search of emails originating from Individual A, RANA and First World
Immigration Services accounts in Chicago for 2009 has revealed no records
reflecting the use of First World's services by Danish residents;

c.    Although Individual A and Individual B discussed the trip to Denmark for the
Mickey Mouse project extensively in email exchanges and by telephone, their
recorded conversations and emails did not touch on the immigration services
business, efforts to establish an office for First World in Denmark or expand its
business in Europe, or the need for advertising;

d.    Likewise, although Individual A's email exchanges with RANA during Individual
A's visit to Denmark discussed Individual A's communications with the *Jyllands-
Posten* about purported plans to advertise for First World, those communications
did not discuss in any detail other aspects of establishing a new branch of First
World in Denmark. Although Individual A advised RANA that a representative
of the *Jyllands-Posten* might call First World's offices, he did not suggest that

First World would be receiving similar calls from other potential business partners or vendors in Denmark;

e.    Had Individual A and RANA been interested in obtaining information about advertising in the *Jyllands-Posten*, such information is readily available on the newspaper's web site, as is the name and phone number of the newspaper's sales representative;

f.    Prior to his visit to Denmark, Individual A had expressed his displeasure at the *Jyllands-Posten* cartoonists "who slandered our prophet," and said that "I feel disposed towards violence for the offending parties," making it unlikely that Individual A would seek to patronize the *Jyllands-Posten* as a business advertiser;

g.    The list of items that Individual A prepared and emailed to himself relating to the Mickey Mouse Project on December 7, 2008, described above, contains multiple references that do not appear consistent with plans to open an immigration office, including "Route Design (train, bus air)"; "Cross (Cover Authenticator)"; "Counter surveillance (magic eye)"; "Security (armed)?"; "Zoom"; and "Entry and exit method in the house." Based on my training and experience, I believe that these notations, particularly in the context of the other information related in this Affidavit, are consistent with planning for a terrorist attack. The list also includes a reference to "Residence for clients." In my experience, it is unnecessary for the typical immigration services business to provide a residence for its clients; by contrast, a team assigned to carry out a terrorist attack in a city where the team's members did not reside would need one or more locations to live while preparing to carry out the attack;

h.    To date, no advertisements have been placed in the *Jyllands-Posten* for First World Immigration Services.

**Individual A Travels to Pakistan Following Denmark Visit**

54.    On January 24, 2009, Individual A departed from Frankfort, Germany to the United Arab Emirates. From there, as discussed below, he subsequently traveled to Pakistan. Records of email accounts reflect that between in or around late January and early March 2009, Individual A sent multiple email messages from locations in Pakistan.

55.    As described earlier, on December 25, 2008, prior to Individual A's departure for Denmark, Individual B instructed Individual A as follows: "first u visit MMP than we

will discuss and c the concerned person if needed." Further, on December 26, 2008,

Individual A responded that he would get a "feel of the property" and "return by middle

of next month to you [Individual B]."

56.     On or about March 3, 2009, Individual A sent an email to RANA. Individual A relayed

that: "[a]s I am traveling and things are so bad these days, I would like to leave a few

instructions with you in case of my death or in case I am incapacitated for some reason."

Individual A continued in detail, providing instructions to RANA on how to handle his

affairs, including his wishes for his family. In an email response provided the same day,

RANA stated "I acknowledge receipt of this will." Then, in coded language, RANA

directed Individual A to communicate with him in a separate email account. More

specifically, RANA stated:

> One of my brothers in Brigadier **Mov**adat Hussain Rana and the other is Sibte
> Hassan Rana **monie**. They are in Rawalpindi. I really admire emails making it
> instant half mulaquat especially **yahoo** as it seems superior to hotmail. Talk to
> you later.

(Emphasis supplied)

57.     Records reveal that the mov.monie@yahoo account was created on or about March 6,

2009, at a particular internet protocol address, the user of which was located at the

business address of First World Immigration. The subscriber name provided when this

account was opened was "Mr Mov Monie" with a date of birth of February 13, 1962.

RANA's actual birthdate is exactly one digit off from the month, date and year provided

to open the mov.monie@yahoo account.

58.    On the same day that the mov.monie@yahoo account was created, Individual A sent an

email from mov.monie@yahoo to RANA, stating:

> Dr. Rana, I forgot to mention, [a nickname for Individual B] seems a little upset
> that you may not be responding to his requests in a timely fashion. So please call
> him when you can to put his mind at ease. [Individual A]

59.    In a later email with the "abdalians" Yahoo group, Individual A confirmed his trip to the

Federally Administered Tribal Area ("FATA") region in northwestern Pakistan, bordering

Afghanistan, a region in Pakistan in which various terrorist organizations operate. More

specifically, on or about May 4, 2009, a member of the group sent an email to the group

discussing a recent survey concerning drone attacks in that area. The member's email

stated in relevant part:

> . . . a think tank of researchers and political activists from the NEWFTP and
> FATA, conducts research, survey and collects statistics on various issues
> concerning the Taliban and al-Qaeda terrorism and human security there. AIRRA
> research teams go deep inside Taliban and al-Qaeda-occupied areas of FATA to
> collect information. Most of the areas are not accessible to journalists. Between
> last November and January [the think tank] sent five teams, each made up of five
> researchers, to the parts of the FATA that are often hit by American drones, to
> conduct a survey of public opinion about the attacks. The team visited Wana
> (South Waziristan), Ladda (South Waziristan), Miranshah (North Waziristan),
> Razmak (North Waziristan) and Parachinar (Kurram agency).

According to the email, one of the conclusions of the survey was that the notion that a

large majority of the local population supports the Taliban is inaccurate. Further, the

sender of the email stated his personal view that the majority of the residents of the

FATA saw the enemy as the Taliban and al Qaeda and viewed the drone attacks as not

violating the sovereignty of Pakistan.

60.  Individual A's sharp response confirmed that he had been to the area occupied by the

Taliban and al Qaeda.  Individual A stated:

> This "survey" is the biggest crock of S ... **I was there on some business recently
> and I assure you this dude is not even close** .. I even doubt the ability of the
> surveyors to conduct this "research" in Miranshah or **Razmak**.[7]  I even challenge
> [the identified individual who posted the survey article] to just walk around the
> bazaar in Miranshah.  This bazaar is bustling with Chechens, Uzbeks, Tajiks,
> Russians, Bosnians, some from EU countries and of course our Arab brothers.
> According to MY survey the foreign population is a little less than a third of the
> total. **Any Waziri or Mehsud I spoke to seemed grateful to God for the
> privilege of being able to host the "Foreign Mujahideen."**

(Emphasis supplied)

61.  On or about June 11, 2009, Individual A returned to Chicago.  Once again, RANA

arranged for this travel.  More specifically, on June 8, 2009, RANA booked the last leg of

Individual A's travel, a flight from New York to Chicago, on JetBlue Airlines.  On or

about June 9, 2009, RANA received an email containing a response to a request for travel

insurance information for  Individual A.  Further, on or about June 10, 2009, RANA

received a confirmation email from JetBlue Airways concerning the last leg of Individual

A's return to Chicago, his flight from New York to Chicago.

### Individual A's Concern Regarding Individual B's Arrest

62.  In or around mid Summer 2009, Individual A became aware that Pakistani authorities had

detained Individual B.  In that time frame, Individual A emailed a contact living in

Pakistan.  The subject of the mail read "[Individual B]?" and I understand Individual A

indicated in this email that Individual B had been arrested, and that Individual A wished

---

[7]      As mentioned above in paragraph 25, news accounts following Kashmiri's
reported death noted that Kashmiri had established a training camp in the Razmak region of
Waziristan.

to know whether Individual B would be available to continue working with Individual A

and Individual A's associates.

### Lashkar-e-Taiba Shifts its Focus From Denmark to Potential New Attack in India

63.    In July and August 2009, Individual A exchanged a series of emails with Lashkar-e-Taiba

Member A.  Certain of these emails are summarized below.

64.    On July 3, 2009, Lashkar-e-Taiba Member A sent Individual A an email in which

Lashkar-e-Taiba Member A said, "i need to see you for some new investment plans."

65.    On July 8, 2009, Individual A sent Lashkar-e-Taiba Member A an email which stated, in

part: "What do you want me to do.  Where are you interested in making investments."

66.    In another email on July 8, 2009, Individual A told Lashkar-e-Taiba Member A that "I

think when we get a chance we should revisit our last location again and say hi to Rahul."

From a review of Individual A's various emails, it is clear that"Rahul" refers to a

prominent Indian actor with the first name "Rahul."

67.    Lashkar-e-Taiba Member A replied to the above email on July 8, 2009 and told

Individual A in an email that "to see rahul is a good idea coz have some work for you

over there too.  Matters are good enough to move forward...."

68.    On July 9, 2009, Individual A responded:

When you say "move forward" do you mean in the North direction or towards
Rahul.  Also in the future if we need to meet to discuss anything, do i have to
come all the way over there or can we meet somewhere in the middle like Africa
or middle east.

69.    The same day, Lashkar-e-Taiba Member A responded that "i mean towards rahul."

27

70.   On July 10, 2009, Individual A sent an email to Lashkar-e-Taiba Member A in which he

stated:

I would like to know a few things if you can tell me:
   1) What is the status with the Northern project, is it still postponed indefinitely?
   2) The visit to Rahul's place, is it for checking out real estate property like before, or something different and if so tell me what you can please.  Also is it exactly in Rahul's city or different one?
   3) How long do you think i will need to stay at Rahuls place to complete this task.
   4) Will i have to stay there continuously for a while, or back and forth like before.

71.   Based on my review of this and other communications, I believe that Individual A had

inquired of Lashkar-e-Taiba Member A whether the Denmark project was on hold, and

whether the visit to India that Lashkar-e-Taiba Member A had asked him to undertake

was for the purpose of surveilling targets for a new terrorist attack.  Later on July 10,

2009, Lashkar-e-Taiba Member A responded to Individual A's email, stating, in part,

that: "There are some investment plans with me, not exactly at Rahul's city but near

that.rest we can decide when meet according to your ease".

72.   In an email to Lashkar-e-Taiba Member A on July 16, 2009, Individual A stated, in part:

"One very important thing I need to know please is that how long do you need me for,

meaning how long should it take me to finish my work, in your opinion. And is it really

urgent? Before it seemed that the Northern Project was really urgent."

73.   After Lashkar-e-Taiba Member A responded on July 18, 2009, that "it may take

somewhere between 2 to 4 weeks," Individual A replied on July 19, 2009, that "I think i

can manage it," and that he would be available in October.  He closed his email by asking

"Is the Northern Investment definitely postponed for now?"  Lashkar-e-Taiba Member A

and Individual A continued to exchange emails through late August 2009, when

Individual A told Lashkar-e-Taiba Member A that he "will be there end of next month."

74.　　I understand these emails to reflect that beginning in July 2009, Lashkar-e-Taiba Member

A was placing a higher priority on using Individual A to assist in planning a new attack in

India than on completing the planned attack in Denmark.　After this time, it appears that

Individual A and Individual B continued the planning of an attack with Kashmiri, rather

than Lashkar-e-Taiba.

### Individual A's Visit to Overseas Locations and Second Visit to Copenhagen

75.　　On or about July 26, 2009, Individual A traveled to Europe, visiting various countries en

route to Copenhagen, Denmark.　As described further below, during Individual A's

second visit to Copenhagen, Individual A took surveillance video of several locations in

Copenhagen, Denmark, including the office of the *Jyllands-Posten* in King's Square in

Copenhagen.

76.　　While Individual A was in Copenhagen, on August 2, 2009, RANA arranged through a

travel agency located at an office building once owned by RANA for airfare for

Individual A to travel from Copenhagen to Chicago through Atlanta.　On August 3, 2009,

RANA received an email confirmation from this travel agency, which, in part, forwarded

an email from Expedia, an online travel agency.　The email stated in pertinent part, "[t]he

itinerary for [Individual A] is attached below.　Thank you for giving us the opportunity to

be of service."　A review of the email reveals that the flight booked by RANA was

"Copenhagen to Chicago" the traveler name was "[Individual A]" and date of travel was

August 5, 2009.

77.   On or about August 5, 2009, Individual A arrived in Atlanta, Georgia, on a flight from Copenhagen, Denmark.  An officer with Customs and Border Patrol interviewed Individual A upon his entry.  Individual A stated that he traveled to Copenhagen, Denmark, and elsewhere in Europe for business.  Individual A claimed to be a consultant for First World Immigration Services.  An examination of Individual A's luggage revealed no papers, flyers or any documents relating to First World Immigration.

**Individual A's Conversation With Individual B After Second Copenhagen Visit**

78.   Following his return from his second visit to Copenhagen, Individual A received an email in response to his inquiry about the arrest of Individual B, described in paragraph 62 above.  The sender wrote, "your friend that u asked about has reached home yesterday. How r u and what r the plans?"  Individual A replied in an email and stated "thank you. I spoke with him after his arrival."

79.   I understand that when Individual A indicated that he "spoke with him after his arrival," Individual A was referring to Individual B.  Phone records for Individual A's cell phone reveal a call the day before he received the above referenced email with a Pakistani phone number.

**Individual A Communications With Lashkar-e-Taiba Member A Regarding Copenhagen**

80.   Following his return from his second visit to Copenhagen, Individual A exchanged emails with Lashkar-e-Taiba Member A, regarding, among other topics, his trip to Copenhagen. On or about August 7, 2009, Lashkar-e-Taiba Member A sent an email asking Individual A why he had not been responding.  That same day, Individual A responded:

> Sorry, I just don't check my mail daily if I don't expect anyone will write me. I am working at a retaurant owned by Dr. Rana's **and his friend** as a manager. Last week they sent me to Germany to buy some Butchery equipment and guess where else I went for 3 days (just for a vacation :) on Dr. Rana's expense

(Emphasis supplied). I understand that in this message Individual A is referring to Copenhagen (inaccurately referenced in the email as Germany) as the place of his "vacation," the same term that he used in his January 23, 2009 email to RANA during his first trip to Denmark. Further, I understand that Individual A is informing Lashkar-e-Taiba Member A that RANA paid for his travel to Copenhagen.

81.    Although Individual A did not identify the friend of Dr. Rana by name in the aforementioned email, on or about August 9, 2009, Lashkar-e-Taiba Member A responded in pertinent part:

> God ..........You are something... how was visit? Did you buy some thing for me? I heard that [Individual B] is with haroon.so be carefull "please"

I understand the statement that this associate "with haroon" is a reference to Individual B's arrest by Pakistani authorities, and the continued detention of Major Haroon by Pakistani authorities. Months before August 2009, Pakistani news reports stated that Haroon had confessed to his role in the murder of General Alvi and provided information about Kashmiri's operations. In fact, on or about April 14, 2009, Individual A had posted an article to the "abdalians" Yahoo group regarding Haroon. The article stated in pertinent part that Haroon "confessed that he had assassinated General Alvi," and confessed that he had kidnaped four separate victims in order to get money for militant organizations.

31

82.   Individual A and Lashkar-e-Taiba Member A continued their exchange about the travel to

Copenhagen.  The following are pertinent excerpts from their continued exchange:

> (Individual A, August 10, 2009)
> Yes, we bought some abbatoir [animal butchery] equipment from there.  I did get
> you something.  The same gift I got for you last time I was there. . . .
>
> (Lashkar-e-Taiba Member A, August 11, 2009)
> . . .what ever i am saying, i know deep in my heart is futile.coz its YOU.regards to
> Dr rana and else.
>
> (Individual A, August 11, 2009)
> I don't understand, what is futile?
>
> (Lashkar-e-Taiba Member A, August 11, 2009)
> futile are my advices, coz you do what you feel like.  matter and situation is not
> clear . . . your skin is dear to me, more than my own

I understand that, in the above exchange, Individual A is reporting on his travel and the

fact that he has additional video surveillance for Lashkar-e-Taiba Member A, and

Lashkar-e-Taiba Member A is recommending that Individual A be careful and expressing

some frustration because Individual A does not always follow advice.

### Individual A, RANA and Individual B Discuss
### Whether Kashmiri Has Received a Report Regarding Their Plans

83.   Throughout the remainder of August and early September 2009, a number of recorded

telephone conversations between Individual A and Individual B reveal that Individual A

continually sought word of whether Individual B had been in contact with Kashmiri

regarding their plans.

84.   On or about August 22, 2009, Individual A and Individual B spoke by telephone.  The

pertinent discussion was as follows:

32

Individual A:  First tell me have you spoken to Doctor[8]

Individual B:  No friend – there is nothing.

Individual A:  Contact.

Individual B:  Nowadays, there is no contact..

* * *

Individual A:  . . . about discussion with Mister Doctor, that if this doesn't – for example – along these lines you should, you should consider that – . . .these who are coming to meet –

Individual B   Hmm

Individual A:  – if they – example what you people had thought about them – in doubt – if they are not fulfilling on it –

Individual B:  Hmm

Individual A:  Then B, B, there should be something as a B, option B.

Individual B:  Okay.

Individual A:  Yeah.

Individual B:  On the contrary, on the contrary, not B, but there should be B and C as well.

Individual A:  Yeah, there should be B and C as well. So that's why – about it – Ahm – okay secondly I – that – used to make an email – I mean, you, you could write on it every now and then.[9]

---

[8]      From my review of recorded communications between Individual A and Individual B, I believe that the use of the term "Doctor" is to refer to Kashmiri and not a reference to RANA.

[9]      As discussed previously, on or about August 28, 2009, in a telephone conversation between Individual A and Individual B, Individual A spoke in coded language to describe a new email account created by Individual A.  Individual A and Individual B, in fact, had at least three separate conversations regarding this account, based, in part, on Individual B's confusion over how Individual A spelled the names of the persons used to create the account.

Individual B:  Okay, yes, yes, yes.

Individual A:  So that, I, I mean, had made one more, and I will give it to you sometime – we can do on it too

Individual B:  Okay

Individual A:  So, about, so think about it.  Because I have a return ticket for October 29[10], for there, to return.

Individual B:  O, okay

Individual A:  Where I came from, recently.

Individual B:  Yes, yes, yes.

Individual A:  So for now, do it, delay it, give priority or put at the end, what is its arrangement.  And secondly, I also said that to you, that also find out, that if, that, I mean that, what I told you, that –

Individual B:  Yes, yes, that, I –

Individual A:  Yeah.

Individual B:  – that, understand, I understand.

85.    I understand that, in the above conversation, Individual A discussed developing other options ("B" and "C") if communications with "doctor" [Kashmiri]  failed or if the "doctor" and his people were otherwise unable to assist in the activity ("if they are not fulfilling on it").  As to option "B," Individual A further commented:

Individual B:  You, you have invested in the business, after that you must show some patience, which is necessary.

---

[10]    On or about August 3, 2009, RANA booked Individual A a return ticket to Copenhagen for October 29, 2009.  This trip was listed in a confirmation email received by RANA on or about August 3, 2009.  Individual A is scheduled to depart at about 6:15 p.m. on a Delta flight from Atlanta to Copenhagen.

Individual A:  **I like the option B. I can do it on my own that is it.** I do not need help of anyone else. I on my own.  I am qualified I have studied accounting. I have taken two semesters in college.  I can do accounting myself, I can do marketing myself.  I do not need anybody's help. The salary that you will give to someone I take it myself.  **And I can do it myself, easily, with no problem at all.**

Individual B:  I see.

Individual A:  Yeah.

(Emphasis supplied).  I understand that in this conversation, Individual A told Individual B that he would make himself available to perform their planned operation.

86.    On or about September 3, 2009, Individual A and Individual B spoke by telephone. Individual A inquired whether Individual B had found out anything, and Individual B responded negatively.  In discussing this further, Individual A related words to the effect that, ever since his return, he has "wanted this project from the bottom of his heart."

87.    On or about September 4, 2009, RANA and Individual B spoke by telephone.  In coded language, RANA asked Individual B about his earlier arrest: "okay, you remember when you had fever during that time – did you ever faint due to the fever?"  Individual B responded, "no, no, no, no, no, no. Th-th-that all was fine, there wasn't any problem." RANA then commented, "okay, that is very good."

88.    On or about September 5, 2009, Individual A and Individual B spoke by telephone, and Individual B reported that he had not heard any word from "Doctor" [Kashmiri] and Individual A expressed concern that things might have to be "continued" until they receive an answer.  In pertinent part, the conversation was as follows:

Individual B:  However, I wanted to tell you that nothing is happening about that - for that, God willing, I will tell you later, okay?

Individual A:  Right. Ah, unable to find out, anything about that?

Individual B:  Yes, dear. Nothing – absolutely nothing – from there, just, ah, anyway, I will get it from there. It, it, it, it is very quiet now.

Individual A:  But, but have, haven't you had any contact with the doctor yet? You should contact Doctor.

Individual B:  No, no, no, absolutely nothing – unable to find out anything, at this time.

Individual A:  So, if, if you are unable to contact – then, then, then, in that case, it needs to be continued until receive an answer from there, right?

Individual B:  No, no, no, I can do it – but still waiting for an answer. Going to wait for a little while. It is absolutely quietness over there. There is absolutely nothing, from anything like that.

89.     On or about September 7, 2009, Individual A and Individual B again spoke by telephone.

After Individual A asked Individual B to tell him something new, Individual B responded

words to the effect of "nothing has been happening from there" and that he was "unable

to find out anything about that." Thereafter, the following exchange occurred:

Individual A:  .... **anyhow, then you need to tell him everything, whatever I told you.** Didn't you convey him everything whatever I had told you, about him? Or still, it has not been conveyed to him at all?

Individual B:  No. There is absolutely nobody. Look, from there, from there, ah, it, that is, has been, ah, it has been completely cut off.

Individual A:  But, ah – it is okay, never mind.

Individual B:  No, unable to find it out. On, on that, that day, it is not like I am just sitting here. I, I am trying my best for it.

Individual A:  Right.

Individual B:  That is –

36

90.     Based on my review of the above recording, as well as other recorded conversations, described below, between Individual A and Individual B, and Individual A and RANA, I understand from the above conversation that Individual A wanted to ensure that "Doctor [Kashmiri]" received the information Individual A had passed on to Individual B.

91.     That same day, on or about September 7, 2009, Individual A reported to RANA on the lack of contact between "Doctor [Kashmiri]" and Individual B. Individual A expressed concern that his "reports" and "notes" would not be delivered. The pertinent part of the exchange was as follows:

Individual A:  And, **gathering together, whatever reports I had given to [Individual B], [Individual B] has not been able to pass on the report to him**. It's been months. There is action going on, you know. It's in the way of [UI] Today, in the north, after many weeks, there was an attack in the north. It hadn't happened in months. And, it is in the north, where he live[s].

RANA:       I see

Individual A:  In any case, I don't know much, God will help.

RANA:       Whatever happens, hope it is for the best.

Individual A:  Yes.

RANA:       When you know that he received the **notes**, then –

Individual A:  God willing, he'll find a solution...

(Emphasis supplied).

92.     In this same recorded conversation on September 7, 2009, Individual A and RANA discussed and named multiple targets of their planning. More specifically, Individual A listed four targets, one of which was "Denmark," then commented "[a]fter that if I will pray for any other action call me a thief . . .God may help me complete this task." Later

37

in this same conversation, RANA asked Individual A to "pass along a message" to Individual B. RANA then stated words to the effect that "top class" was a "befitting" name for Individual B. RANA and Individual A then discussed a fifth target. More specifically, Individual A referred to the earlier discussion, and stated words to the effect of "oh my friend, not four, five, five." While RANA laughed, Individual A stated "Defense College" twice, and RANA commented "right, this is it. I knew already." After other discussion, RANA continued "That one, uh, I thought that was the target."[11] Individual A responded, "I don't know but once he comes then it will be known, but I am going to ask him to do that one first." RANA responded, "in this matter – defense [UI]."

### Individual B Reports Death of Ilyas Kashmiri

93.    On September 13, 2009, at 4:56 p.m., following limited press reports from a week earlier that Ilyas Kashmiri may have been killed in a drone attack in the FATA area of Pakistan, a telephone call took place between Individual A in Chicago, Illinois, and Individual B in Pakistan. During the telephone call, Individual B told Individual A in code that Kashmiri might be dead: he stated that the "doctor" may have "gotten married there" but that there was no confirmation. Individual A seemed surprised and said that he had not seen it on the news. Individual B mentioned that "maybe" it was in the "print media," and instructed Individual A to "search in there [print media]." During that same telephone call, Individual A later stated, "so it means, our company has gone into bankruptcy then," and "the **projects** and so forth will go into suspension for the time being." (Emphasis

---

[11]    Although this conversation was in the Urdu language, RANA used the English word "target." Based on my review of this and other conversations, I understand "defense college" to refer to another overseas target.

38

supplied).  Individual B responded words to the effect of "no, no, why?  **Projects** will continue." (Emphasis supplied).  Although this conversation was mainly in the Urdu language, both Individual A and Individual B used the English word "projects."

94.  In this same conversation Individual A advised Individual B that he would tell RANA "this news regarding doctor," but Individual B responded "don't do it right now" and asked Individual A to wait "three, four days."

95.  Almost immediately following the conclusion of the telephone call during which Individual B instructed Individual A to "search" the "print media," Individual A conducted a "google" search of "Ilyas Kashmiri."  (The September 13 telephone call began at 4:56 p.m. Chicago time and ended at 5:09 p.m.  The "Ilyas Kashmiri" search took place approximately 3 minutes later at approximately 5:12 p.m.)

96.  Later on September 14, 2009, Individual A telephoned RANA and advised him of his telephone call with Individual B and advised RANA that Individual B had asked them to pray for "the doctor."  Individual A explained that "so far it is a rumor, it is not confirmed yet," but he may have gotten "married."  Individual A continued with words to the effect of "pray that this should not have happened," and RANA responded "we will talk about this."

97.  On or about September 16, 2009, Individual A again performed a google search for "Ilyas Kashmiri" at approximately 7:29 p.m.  On that date, a new press report had appeared online indicating that Ilyas Kashmiri had been killed on September 14, 2009, in a drone attack while a different terrorist had been killed in a separate drone attack the week

before.  Thus, the report indicated that the killing of Kashmiri would have taken place the

day after Individual B had told Individual A that Kashmiri had already been killed.

98.    On September 17, 2009, at 2:17 a.m., Individual A spoke to Individual B by telephone

and appeared to relay this development in a coded conversation.  Individual A stated that:

"it is everywhere now . . . that their marriage has been confirmed." But Individual A

noted that Individual B told him "four or five days ago but these guys are saying that it is

only a two or three days old matter." Individual B responded, "No – yeah – it happened

again one or two days ago." As Individual A confirmed subsequent to his arrest, the

conversation also made clear that "property," "investments" and other business terms

were used as cover terms for violent actions.  In apparent reference to the drone strikes

that killed Kashmiri and others,  Individual A stated that RANA "was saying –  there is

some sort of arrangement that very accurate -- I mean that of these guys -- the estimates of

all of them are so accurate . . . The estimate -- whatever **assessment** they do for any

**property** is always accurate, so that have very . . . a discerning eye, a very discerning eye

on the market. . . . There was their picture also.  They were giving their picture also, of

the bride and the bridegroom." (Emphasis supplied.)[12] (Press reports at the time had

pictures of Kashmiri and another person believed to have been killed in the attack.)

Individual A also stated that he would be coming to Pakistan soon "but now there is

nothing to do there.  Now let us collect unemployment from the company . . .  when a

company lays off in case of bankruptcy, it discharges employees." When Individual B

---

[12]        Although this conversation was mainly in the Urdu language, the words
"assessment" and "property" were spoken in English.

40

tried to assure Individual A that Kashmiri's death was a "small loss," Individual A

disagreed and responded: "no, it is not a small loss, it is a major loss."

99.    In this same conversation, Individual A told Individual B that in light of Kashmiri's

reported death, "Now I think you better go back towards him, towards [Lashkar-e-Taiba

Member A]." Individual A complained to Individual B that "[Lashkar-e-Taiba Member

A] and others, and this [an identified individual] and all of them – again they are – their

eyes are again in that direction." He added that Lashkar-e-Taiba Member A and the

identified individual were unwilling to take risk and "have rotten guts." Individual B said,

"when in business a person wants to do something, there is risk factor also. They do not

want to take risk and they want to be praised also." Individual A responded, "then there

will be no profit because when you have high aim, as much an investment will be risky as

much is the chance of profits and at the same time there is chance of loss."

100.    In the same telephone conversation, Individual B stated that "This is business sir these

type of things happen." Individual A responded that "I am just telling you that the

companies in your competition they have started handling themselves in a far better way

that is why they all are running in losses profit-wise and market-wise. There are

continuous losses and it does not seem that they will recover. In these conditions it looks

that there will be bankruptcy in approximately six months, my estimate within . . . six to

twelve months is that our companies will be done the way things are going on."

Individual B responded, "it is as it usually happens that if one company fails then another

company will come up."

101. Later that same evening, on or about September 17, 2009, Individual A spoke to an associate in Pakistan by telephone. The associate related to Individual A that the cleric that Individual A went to see passed away, and asked if Individual A had confirmed it with Individual B. Individual A responded words to the effect that Individual B confirmed it five, six days ago and said that the cleric died of a heart attack. Individual A further related that he was very sad and upset about the death. Two days later, on or about September 19, 2009, Individual A again spoke by telephone with this same associate. Individual A asked the associate if he had learned anything about "doctor," and stated words to the effect of: ""[h]e was you Pir Sahib [spiritual guide], where I and you went, we went to Samanabad and we did Baiat [an oath of allegiance]." After the associate responded, "[y]es sir, absolutely, absolutely," Individual A continued "he just had a heart attack . . .it has made me very sad." Based on my review of these recorded conversations, and the earlier recorded conversations between Individual A and Individual B, I understand that the "cleric" to whom they are referring is the "Doctor," Kashmiri. I understand that the "heart attack," similar to the term "married," is code for the fact that Kashmiri was killed. I further understand that Individual A is discussing a visit to Kashmiri when he swore an oath of allegiance to Kashmiri.

102. As set forth above in paragraph 25, on or about September 18, 2009, Individual A forwarded to RANA by email a news article relating to Kashmiri's reported death. The subject of the email written by Individual A was "Major Haroon (Hafiza hullahu)[May Allah Protect Him]." The forwarded article was titled "Pakistani Kashmiri militants now fighting NATO forces," and contained a number of details about Kashmiri.

42

103.    On or about September 20, 2009, Individual A spoke with a different associate in

Pakistan in a recorded telephone conversation. Individual A related words to the effect

that he had discussed with RANA the fact that "business must go on." Individual A

continued, "main thing that I have an income...make some money. I don't care that if I

am working for Microsoft or I am working for a...any...GE or Philips, I don't care. As

long as I am making money, I don't give a shit." Based on my review of this and other

conversations involving Individual A, I believe that Individual A is indicating that he

does not care whether he works for Kashmiri's group or Lashkar-e-Taiba, as long as he

helps carry out attacks.

### Individual A, RANA, and Individual B Discuss News that Kashmiri Might be Alive

104.    On or about September 21, 2009, Individual A spoke with Individual B by telephone:

Individual B:   Buddy, the reports that are com-coming in, by the grace of God, he is
                doing well.

Individual A:   God willing – uh, uh – you mean the Doctor?

Individual B:   Yes, yes.

Individual A:   Uh, I, Buddy if this is true, then I will say 100 prayers, 100 prayers.

105.    In this same telephone conversation, Individual A again referred to the earlier news about

Kashmiri, this time using the terms "Pir" and "heart attack," the same terms that

Individual A used to describe Kashmiri and his reported death to his relative, as discussed

above, and about Kashmiri, stated that "there were some more stories published about

him – that – about whom we were thinking that didn't, didn't reach the completion stage

– the **investments,** etc." (Emphasis supplied)  Individual A, in fact, had performed

additional google searches of "Ilyas Kashmiri" and accessed a number of news articles

relating to the terrorist activities of Kashmiri, one of which he forwarded to RANA, as

described above. In the same conversation, Individual A continued, "it's quite a detailed

writing . . .there was a lot of praise, there was a lot of praise for him – what we call

praise."

106.  Four days later, on or about September 25, 2009, RANA spoke by telephone with the

Consul General at the Pakistani Consulate in Chicago in an effort to obtain a 5-year visa

for Individual A to travel to Pakistan.  It is clear from email traffic unrelated to terrorist

plotting that the Consul General knows RANA and Individual A personally as all three

attended the same high school.  However, the Consul General knows Individual A by a

different name.  (Individual A changed his name to an Americanized name in 2006.)  In

seeking a visa for Individual A, RANA stated that he wished to obtain the visa for a white

American named "[Individual A]" who did not have any Pakistani background at all.

When the Consul General suggested that RANA send this friend to the consulate, RANA

explained that he had sent his friend elsewhere to take care of some unspecified business

so that someone else would visit the consulate.  It is clear from the foregoing

conversation that RANA was attempting to deceive the Consul General into granting a

visa for Individual A without the Consul General knowing for whom the visa would be

issued.

107.  On or about September 30, 2009, Individual A and Individual B again spoke by

telephone. Individual B informed Individual A that "Pir Sahib" is "absolutely all right."

Individual A asked Individual B to "swear" several times, and Individual B responded "I

swear, I am telling the truth." Individual A added, "so he does not get married," and asked "so, then, I will be able to meet him upon returning." Individual B responded words to the effect of "absolutely, right, and he – just today – just today, was asking about you." Based on my review of this conversation, as well as preceding conversations, I believe that the reference to "Pir Sahib" is Kashmiri.

108.   Shortly after speaking with Individual B, Individual A spoke to RANA by telephone. Individual A informed RANA that "Pir Sahab is alive." RANA responded, "wow, all praise be to God."

109.   Based on recorded conversations with associates and other third parties, Individual A intended to travel to Pakistan in early October 2009. Before doing so, Individual A intended to travel to Philadelphia from Chicago. On or about September 8, 2009, Individual A received an email confirmation from Orbitz, an online travel agency, reflecting the purchase of airfare from Chicago to Philadelphia on October 3, 2009.

110.   On October 3, 2009, Individual A was arrested at O'Hare Airport in Chicago before boarding his scheduled flight to Philadelphia. Agents searched his checked luggage pursuant to a search warrant issued by United States Magistrate Judge Arlander Keys on October 2, 2009. Among other items recovered from Individual A's checked luggage was (1) a photocopy of the front page of an August 1, 2009 issue of the *Jyllands-Posten*; (2) a street guide for Copenhagen, Denmark; and (3) a list of phone numbers, including a Pakistani telephone number Individual A had used to contact Individual B. Also contained in the luggage was a memory stick. Contained on this memory stick were approximately ten short videos, including videos taken of King's Square both during the

day and at night. The daytime video of King's Square includes close-up shots of the entrance to the *Jyllands-Posten* office. The videos also include shots of what appears to be the entrance to a military barracks, a close-up of a guard stationed near the entrance to that location, and of the exterior and interior of Copenhagen's central train station (consistent with the first item on the checklist described in paragraph 36 ("Route desing (train, bus, air)").

### Interview of Rana

111. On October 18, 2009, RANA was arrested. After being advised of and waiving his *Miranda* rights, RANA provided the following statements: (1) he was aware that Individual A had been affiliated with the Lashkar-e-Taiba terrorist organization for the past few years, (2) he was aware that Individual A had received training from the Lashkar-e-Taiba terrorist organization, (3) he was aware that Individual A had met with Ilyas Kashmiri within the past year, (4) he was aware that Individual A communicated with Individual B and LeT Member A, (5) he was aware that Individual A was angry about the cartoon depictions of the Prophet Mohammed, (6) he was offended by the cartoon depictions of the Prophet Mohammed and would not have done business with the newspaper that published them, and (7) he had discussed the cartoonist and editor from

the *Jyllands-Posten* with Individual A. This is not intended to be an exhaustive account

of statements that RANA has made, but a summary for purposes of this affidavit.

Lorenzo Benedict
Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN
before me this 18 day of October 2009

NAN R. NOLAN
UNITED STATES MAGISTRATE JUDGE

47